**COPY**

1   Christopher T. Heffelfinger (Cal. Bar No. 118058)
2   cheffelfinger@bermandevalerio.com
    Matthew D. Pearson (Cal. Bar No. 235339)
3   mpearson@bermandevalerio.com
4   **BERMAN DeVALERIO**
    One California Street, Suite 900
5   San Francisco, CA  94111
6   Telephone: (415) 433-3200
    Facsimile: (415) 433-6382
7

8   **Counsel for Plaintiff Xi Zhang**

9   **[Additional Counsel Appear on Signature Page]**

10              UNITED STATES DISTRICT COURT
11           CENTRAL DISTRICT OF CALIFORNIA
12

13

14  XI ZHANG, Individually and on Behalf of       No. **SACV10-01887** CJC (RNBx)
    All Others Similarly Situated,
15
                                                   CLASS ACTION
16                          Plaintiff,
                                                   **COMPLAINT FOR**
17                vs.                               **VIOLATION OF FEDERAL**
                                                   **SECURITIES LAWS**
18
19  RINO INTERNATIONAL
    CORPORATION, KENNITH C.
20  JOHNSON, ZEJIN LI, JENNY LIU,                  JURY TRIAL DEMANDED
    JIANPING QIU, XIE QUAN, BEN WANG,
21  LI YU, WEIGUO ZHANG, and DEJUN
    ZOU,
22
23                          Defendants.
24
25
26
27
28

COMPLAINT

FILED
CLERK, U.S. DISTRICT COURT

DEC 10 2010

CENTRAL DISTRICT OF CALIFORNIA
BY                        DEPUTY

1    Plaintiff Xi Zhang alleges the following based upon personal knowledge with

2    respect to Plaintiff and, with respect to other matters, the investigation of Plaintiff's

3    counsel. Counsel's investigation included a review of U.S. Securities and Exchange

4    Commission ("SEC") filings made by RINO International Corporation ("RINO" or

5    the "Company"), the Company's press releases and other public statements, securities

6    analysts' reports, media reports, and other sources. Plaintiff believes that substantial

7    corroborating additional evidentiary support will exist for the allegations set forth

8    herein after a reasonable opportunity for discovery. "Defendants" as used in this

9    Complaint refers to RINO, Kennith C. Johnson, Zejin Li, Jenny Liu, Jianping Qiu, Xie

10   Quan, Ben Wang, Li Yu, Weiguo Zhang, and Dejun Zou.

11                             **JURISDICTION AND VENUE**

12       1.    The claims asserted herein arise under Sections 10(b) and 20(a) of the

13   Securities Exchange Act of 1934 (the "Exchange Act") (15 U.S.C. §§ 78j(b) and

14   78t(a)) and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5).

15       2.    This Court has jurisdiction over the subject matter of this action under

16   Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331.

17       3.    Venue is proper in this District under Section 27 of the Exchange Act, 15

18   U.S.C. § 78aa and 28 U.S.C. § 1391(b).  Many of the acts and transactions alleged

19   herein occurred in substantial part in this District. At all relevant times, the Company

20   maintained an office in this District.

21       4.    In connection with the acts alleged in this Complaint, Defendants,

22   directly or indirectly, used the means and instrumentalities of interstate commerce,

23   including, but not limited to, the mails, interstate telephone communications, and the

24   facilities of the national securities markets.

25                             **NATURE OF THE ACTION**

26       5.    This is a class action on behalf of all investors who purchased or

27   otherwise acquired the common stock of RINO from July 13, 2009 to November 12,

28

1 | 2010, inclusive (the "Class Period"). This action seeks relief under Sections 10(b) and

2 | 20(a) of the Exchange Act and SEC Rule 10b-5.

3 | ### SUMMARY

4 |     6.    During the Class Period, RINO asserted that, through its subsidiaries and

5 | controlled affiliates, it was a leading provider of clean technology solutions for the

6 | iron and steel industry in China, including wastewater treatment and flue gas

7 | desulphurization equipment. RINO reported significant revenue growth during the

8 | Class Period, propagating an image of a company on the rise. Indeed, in its press

9 | releases and SEC filings in 2008 and 2009, the Company reported record revenues.

10 | For 2008, the Company reported revenues of $139.3 million. For 2009, the Company

11 | reported that its revenues had grown to $192.6 million.

12 |     7.    In reality, RINO's revenues were a fraction of what the Company

13 | claimed them to be. On November 10, 2010, a research firm, Muddy Waters LLC

14 | ("Muddy Waters"), issued a report claiming that RINO had fabricated customer

15 | relationships and grossly overstated revenue. The Company had reported 2009

16 | revenues of only $11 million to Chinese regulators, as compared to $192.6 million

17 | reported to the SEC. At most, Muddy Waters estimated that the Company generated

18 | $15 million of revenue in 2009.

19 |     8.    On November 19, 2010, the Company confirmed that its annual financial

20 | statements for 2008 and 2009, along with its interim quarterly financial statements

21 | during 2008, 2009, and 2010, should no longer be relied on by investors. Defendant

22 | Dejun Zou, RINO's Chief Executive Officer, told RINO's auditor that the Company

23 | had not in fact entered into two customer contracts questioned in the Muddy Waters

24 | report. According to the auditor, Zou stated that there may be problems with 20 – 40%

25 | of the Company's other customer contracts. The SEC has since opened a formal

26 | investigation into RINO's financial reporting and compliance with the Foreign

27 | Corrupt Practices Act.

28 |

9.     These revelations indicate that, during the Class Period, the Company issued materially false and misleading statements concerning RINO's business practices and financial results. These misleading statements artificially inflated the price of RINO stock bought by investors during the Class Period. Further, by artificially inflating the price of RINO common stock, in December 2009 the Company was able to complete a registered direct offering of millions of shares of common stock and warrants to select institutional investors at $30.75 per share, for total proceeds of almost $100 million.

10.    Since Muddy Waters released its report on November 10, 2010, the price of RINO common stock has dropped $9.45, a decline of nearly 61%. The NASDAQ Global Market ("NASDAQ") halted trading in RINO on November 17, 2010 with the price of RINO common stock at $6.07. The Company's stock traded as high as $34.25 during the Class Period. The NASDAQ delisted RINO's stock on or about December 8, 2010.

## PARTIES

11.    Plaintiff Xi Zhang, as set forth in the accompanying certification, incorporated by reference herein, purchased RINO common stock at artificially inflated prices during the Class Period and has been damaged thereby. Plaintiff resides in Santa Clara County, California.

12.    Defendant RINO International Corporation is a Nevada corporation with its principal executive offices located at 11 Youquan Road, Zhanqian Street, Jinzhou District, Dalian, People's Republic of China 116100. The Company maintains an office located at 30211 Avenida de las Banderas, Suite 200, Rancho Santa Margarita, California 92688.

13.    RINO is a holding company. Through its direct and indirect subsidiaries, RINO purports to design, manufacture, install, and service environmental protection equipment used by China's iron and steel industry, such as wastewater treatment and flue gas desulphurization ("FGD") equipment. The Company also designs and sells

1  anti-oxidation products used in the manufacture of hot rolled steel plate products.

2      14.    RINO's common stock began trading on the NASDAQ under the ticker

3  "RINO" on July 13, 2009. Prior to being listed on the NASDAQ, RINO was listed on

4  the Over-the-Counter Bulletin Board ("OTCBB") under the symbol "JDMC."

5      15.    Defendant Kennith C. Johnson ("Johnson") has served as a director of the

6  Company since 2008.

7      16.    Defendant Zejin Li ("Li") has served as a director of the Company during

8  the Class Period.

9      17.    Defendant Jenny Liu ("Liu") served as the Company's Chief Financial

10 Officer from June 2009 through April 2010.

11     18.    Defendant Jianping Qiu ("Qiu") has served as the Chairman of the

12 Company's board of directors since 2008.

13     19.    Defendant Xie Quan ("Quan") has served as a director of the Company

14 since March 2008.

15     20.    Defendant Ben Wang ("Wang") has served as the Company's Chief

16 Financial Officer since April 2010.

17     21.    Defendant Li Yu ("Yu") has served as RINO's Chief Accounting Officer

18 since November 2009 and its accounting manager since the Company's inception.

19     22.    Defendant Weiguo Zhang ("Zhang") served as a director of the Company

20 beginning in March 2008 until at least October 8, 2010.

21     23.    Defendant Dejun Zou ("Zou") has served as the Company's Chief

22 Executive Officer and a director since 2007.

23     24.    Defendants Zou and Qiu are married. Together, they own Dalian Rino

24 Engineering Science and Technology Co., Ltd., which is RINO's main operating

25 entity controlled contractually by RINO through a 100 percent owned subsidiary.

26     25.    Defendants Johnson, Li, Liu, Qiu, Quan, Wang, Yu, Zhang, and Zou are

27 collectively referred to herein as the "Individual Defendants."

28

26.     During the Class Period, each of the Individual Defendants, by reason of their management positions, board membership, and/or ownership of the Company's stock or options, were at all relevant times controlling persons of RINO within the meaning of Section 20(a) of the Exchange Act. The Individual Defendants had the power and influence to cause RINO to engage in the unlawful acts and conduct alleged herein, and did exercise such power and influence. The Individual Defendants are liable for the false statements pleaded in ¶¶ 27-40 as those statements were "group-published" information.

## PRE-CLASS PERIOD
## MATERIALLY FALSE AND MISLEADING STATEMENTS

27.     On March 31, 2009, when the Company's stock was trading on the OTCBB market, RINO filed its annual report with the SEC on Form 10-K for the year ended December 31, 2008 ("2008 10-K"). The 2008 10-K reported, in relevant part:

> Our revenues increased 119.8% to $139.3 million for fiscal year 2008 from $63.4 million for fiscal year 2007. Our gross profit increased 78.3% to $54.3 million for fiscal year 2008 from $30.5 million for fiscal year 2007. Our income from operations increased 36.9% to $21.6 million for fiscal year 2008 from $15.8 million. Our after-tax net income increased 108.3% to $21.3 million for fiscal year 2008 from $10.2 million for fiscal year 2007. Without taking into account certain non-cash stock compensation expenses that we incurred in connection with our release of the Make Good Escrow Shares to the Innomind Trust with our founders as beneficiaries, our income from operations increased 67.9% to $39.1 million for fiscal year 2008 from $23.3 million from fiscal year 2007, and our after-tax net income increased 118.9% to $38.8 million for fiscal year 2008 from $17.7 million for fiscal year 2007.

> * * *

> Our desulphurization system has been installed in steel mills such as

1    Jinan Iron & Steel Co., Panzhihua Iron & Steel, Shengfeng Iron & Steel,

2    Handan Iron & Steel, Chongqing Iron & Steel. [sic] and Kunming Iron &

3    Steel, Hulingnianyuan Iron and Steel, Nanchangchangli Iron & Steel,

4    Qianjing Iron & Steel and Yuhua Iron & Steel. For fiscal years 2007 and

5    2008, revenues generated from our desulphurization business was $33.1

6    million and $105.3 million, respectively, representing 52.3% and 75.6%

7    of our total revenues for fiscal years 2007 and 2008, respectively.

8    **DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS**
**ISSUED DURING THE CLASS PERIOD**
9

10    28.    The Class Period begins July 13, 2009, when the Company's common

11 stock began trading on the NASDAQ.

12    29.    On August 10, 2009, the Company issued a press release titled, "RINO

13 International Corp. Announces Second Quarter 2009 Financial Results." The release

14 stated, in part:

15    SECOND QUARTER 2009 SUMMARY FINANCIAL RESULTS

|  | Q2 2009 | Q2 2008 | CHANGE |
| --- | --- | --- | --- |
| Net Sales | $40.7 million | $34.6 million | +17.6% |
| Gross Profit | $14.2 million | $15.3 million | -(7.2)% |
| Net Income | $9.9 million | []$5.4 million | +83.0% |
| EPS (Fully Diluted) | $0.39 | $0.21 | +85.7% |

* * *

2009 Second Quarter Financial Results

Net sales for the second quarter ended June 30, 2009 increased 17.6% to

$40.7 million from $34.6 million reported during the second quarter in

2008. Revenue growth was driven by demand for RINO's major product

lines as the Company continued to execute on new and existing project

installations. Specifically, the company recorded $30.1 million in flue gas

desulphurization (FGD) revenues, an increase of 20.3% from $25.0

million reported in the same period of 2008, $9.2 million in wastewater

treatment system sales, an increase of 53.4% over the $6.0 million

1    recorded in the second quarter in 2008, and $1.1 million in anti-oxidation

2    equipment and coatings compared to $1.2 recorded in the same year ago

3    period. The company recorded $0.3 million in machining services

4    revenue, a decrease of 89.6 % from the $2.4 million recorded in the same

5    period in 2008 an. As a percentage of total revenues for the quarter,

6    desulphurization represented 73.9%, wastewater treatment equipment

7    represented 22.7% and anti-oxidation was 2.8%. Cost of sales for the

8    second quarter of 2009 was $26.6 million as compared to $19.3 million

9    in same period 2008, an increase of 37.3%. Gross profit was $14.2

10   million in the second quarter of 2009 as compared to $15.3 million for

11   the same period in 2008, a decrease of 7.2%. Gross margins were

12   approximately 34.8% and 44.1%, respectively. The increase in cost of

13   sales was directly attributable to outsourcing costs associated with

14   meeting project installation timelines. As the Company continues to

15   outsource a meaningful portion of projects due to capacity constraints,

16   gross margins will fluctuate from quarter to quarter, depending on the

17   percentage of revenue mix generated from outsourced projects.

18                                    * * *

19   Mr. Zou Dejun further elaborated, "We are very pleased to report another

20   quarter of strong growth and profitability as we continue to capitalize on

21   our first mover advantage and dominant market position to expand our

22   business. On July 31, 2009, the Chinese Ministry of Industry and

23   Information Technology published a formal plan for the implementation

24   of FGD systems in the sintering plants of Chinese steel companies, which

25   is a specific roadmap to accelerate the number of desulphurization

26   projects completed throughout the PRC. This gives us confidence that

27   growth in our sector will further increase thus benefiting RINO and we

28   are hopeful on winning several new project bids which are currently

under review. We are also reiterating 2009 revenue guidance of $176.5 million."

2009 Six Month Financial Results

For the first six months of 2009 revenues increased 42.2% to $76.3 million from $53.7 million in the year ago period. Flue gas desulphurization sales increased 48.9% to $55.8 million and represented 73.1% of total sales. Wastewater treatment equipment increased 101.0% to $16.5 million and represented 21.6% of sales. Anti-oxidation equipment and coatings increased 26.8% to $3.6 million, representing 4.7% of total sales while machining services decreased 90.4% to $0.5 million. Cost of sales increased 50.5% to $46.2 million yielding gross profit of $30.1 million, an increase of 30.9% from $23.0 million reported in the year ago period. Gross margins were 39.4% compared to 42.8% during the first six months of 2009 and 2008, respectively. Operating expenses decreased 39.6% to $7.5 million during the first six months of 2009 from $12.5 million during the year ago period, which included a $5.8 million non-cash equity compensation charge. Income from operations increased 115.2% to $22.6 million from 10.5 million with operating margins of 29.6% compared to 19.4%. Net income for the first six months of 2009 increased 114% to $22.3 million from $10.4 million with corresponding diluted earnings per share of $0.89 compared to $0.41 based on 25.1 million and 25.2 million diluted shares in each respective period. The company incurred no income taxes.

30.     Defendant Liu is listed as the contact person for the Company on the August 10, 2009 press release. The Company filed the press release with the SEC on August 10, 2009 as an exhibit to a current report on Form 8-K. Defendant Liu signed the 8-K report.

31.     On August 10, 2009, RINO filed its quarterly report on Form 10-Q for

1  the period ended June 30, 2009 ("2Q2009 10-Q"). In its 2Q2009 10-Q, the Company

2  reaffirmed the financial results it announced in the August 10, 2009 press release.

3  Defendants Zou and Liu signed the 2Q2009 10-Q, and each signed certifications

4  required by the Sarbanes-Oxley Act that accompanied the 2Q2009 10-Q. The

5  certifications attested to the veracity of the financial statements, warranted that the

6  Company had in place adequate financial controls, and confirmed that all significant

7  deficiencies and material weaknesses had been disclosed to the Company's auditors.

8      32.    On November 13, 2009, the Company issued a press release titled,

9  "RINO International Corp. Announces Record Third Quarter 2009 Financial Results."

10  The release stated, in part:

11      2009 Third Quarter Financial Results

12      Net revenues for the third quarter ended September 30, 2009 increased

13      41.0% to $63.3 million as compared to $44.9 million for the third quarter

14      in 2008. Revenue growth was driven by demand across its product lines,

15      including a significant increase in both wastewater treatment and anti-

16      oxidation systems and coatings sales. Specifically, the Company recorded

17      $33.3 million in desulphurization revenues, a decrease of 11.8% from the

18      third quarter of 2008, $15.1 million in wastewater treatment system sales,

19      an increase of 241.9% from the third quarter of 2008, and $13.8 million

20      in anti-oxidation equipment and coatings, an over 8-fold increase

21      compared to the same year ago period. The Company recorded $1.1

22      million machining service revenues.

23                          * * *

24      "The third quarter continued our momentum as we executed on our

25      growth plan while making further improvements in all of our key

26      financial metrics," stated Mr. Zou Dejun, President and CEO of RINO

27      International. "This was the first quarter we saw meaningful uptake by

28      customers for our anti-oxidation systems. During the quarter we

1  performed work on a total of 12 FGD desulphurization systems, 5

2  wastewater treatment systems and installed 7 anti-oxidation systems for a

3  total of 23 customers. We are excited about our DXT desulphurization

4  system which we believe will enable us to cement our position as the

5  leader in this particular FGD application, while providing a strong

6  conduit for growth during the next few years as adoption accelerates. In

7  addition, our backlog as of September 30, 2009 was approximately $52.7

8  million, which represents 6 desulphurization, 4 wastewater treatment and

9  6 anti-oxidation projects. We believe our collective growth initiatives

10  will continue to provide incremental and robust top-line and bottom line

11  growth and we currently expect to surpass our previous revenue estimate

12  of $176.5 million for 2009".

13  2009 Nine Month Financial Results

14  For the first nine months of 2009 revenues increased 41.7% to $139.6

15  million from $98.5 million in the year ago period. FGD sales increased

16  18.5% to $89.1 million and represented 63.8% of total sales. Wastewater

17  treatment equipment increased 150.1% to $31.6 million and represented

18  22.6% of sales. Anti-oxidation equipment and coatings increased 308.9%

19  to $17.4 million, representing 12.5% of total sales while machining

20  services were $1.6 million.

21      33.    Defendant Liu was listed as the contact person for the Company on the

22  November 13, 2009 press release.

23      34.    On November 13, 2009, RINO filed its quarterly report on Form 10-Q

24  with the SEC for the period ended September 30, 2009 ("3Q2009 10-Q"). In its

25  3Q2009 10-Q, the Company reaffirmed the financial results it announced in the

26  Company's November 13, 2009 press release. Defendant Zou signed the 3Q2009 10-

27  Q. Defendants Zou and Liu each signed certifications required by the Sarbanes-Oxley

28  Act that accompanied the 3Q2009 10-Q. The certifications attested to the veracity of

1   the financial statements, warranted that the Company had in place adequate financial

2   controls, and confirmed that all significant deficiencies and material weaknesses had

3   been disclosed to the Company's auditors.

4       35.     On March 31, 2010, RINO issued a press release titled, "RINO

5   International Corp. Announces Record 2009 Revenue and Net Income." The release

6   stated, in part:

7       -- Fourth Quarter 2008 [sic] Sales Increase 29.9% to $53.0 million,

8       *Adjusted Net Income Increases 92.9% to $13.5 million with EPS of

9       $.53

10      -- 2009 Sales Increase 27.7% to $192.6 million, **Adjusted Net Income

11      Increases 47.3% to $57.3 million with EPS of $2.26

12      -- 2009 Cash flow from operations increased 414.4% to $30.9 million

13      -- Cash & Equivalents of $134.5 million on December 31, 2009

14      -- Backlog of $89.4 million on February 28, 2010

15      -- 2010 Guidance: Revenues Expected to Exceed $225 Million

16                          * * *

17      "We are very pleased with our financial results for the fourth quarter and

18      full year of 2009," commented Mr. Zou Dejun, President and CEO of

19      RINO International, "During the fourth quarter of 2009, we experienced

20      continued momentum in installations of our anti-oxidation systems and

21      wastewater treatment systems. In addition, we completed a total of 5

22      FGD desulphurization systems for a total of 5 customers during the

23      fourth quarter. We would like to extend our gratitude to all our investors

24      for their support in the $100 million December financing, which will

25      provide the necessary working capital to secure more projects while

26      expanding our production capacity. . . ."

27                          * * *

28

1   2010 Guidance

2   Management expects to report revenues of approximately $225 million

3   for the fiscal year 2010, representing approximately 17% growth over

4   fiscal 2009 results, and gross margins of between 35% and 40% for 2010.

5   On March 31, 2009 the Company had 28,603,321 common shares

6   outstanding. The Company expects to generate revenue growth in all of

7   its business lines, including contribution from its new sludge dehydration

8   project. In addition, management believes its working capital and cash

9   flow from operations will enable it to meet these projections.

10   36.   On March 31, 2010, RINO filed its annual report on Form 10-K with the

11   SEC for the year ended December 31, 2009 ("2009 10-K"). In its 2009 10-K, the

12   Company reaffirmed the financial results it announced in the Company's March 31,

13   2010 press release. Defendants Zou, Liu, Yu, Qiu, Zhang, Quan, and Johnson signed

14   the 2009 10-K. Defendants Zou, Liu, and Yu signed certifications required by the

15   Sarbanes-Oxley Act, which accompanied the 2009 10-K. The certifications were

16   substantially similar to the certifications referenced in ¶ 31 above.

17   37.   The Company's 2009 10-K also stated:

18   Our desulphurization system has been installed in steel mills such as

19   Jinan Iron and Steel Co., Panzhihua Iron & Steel, Shengfeng Iron &

20   Steel, Handan Iron & Steel, Chongqing Iron & Steel. [sic] and Kunming

21   Iron & Steel, Hulingnianyuan Iron and Steel, Nanchangchangli Iron &

22   Steel, Qianjing Iron & Steel ,Yuhua Iron & Steel, Zhuhai Yueyufeng Iron

23   & Steel, Hefei Iron & Steel, Jiangsu Xigang Iron & Steel, Zhangdian Iron

24   & Steel and Hunan Lianyuan Iron &Steel . For fiscal years 2008 and

25   2009, revenues generated from our desulphurization business was $105.3

26   million and $116.4 million, respectively, representing 75.6% and 60.4%

27   of our total revenues for fiscal years 2008 and 2009, respectively.

28   38.   On May 14, 2010, RINO filed its quarterly report on Form 10-Q with the

1  SEC for the period ended March 31, 2010 ("1Q2010 10-Q"). The 1Q2010 10-Q

2  contained the same financial information described in the subsequent May 17, 2010

3  press release, described in ¶ 39 below. Defendant Zou signed the 1Q2010 10-Q.

4  Defendants Zou and Wang signed certifications required by the Sarbanes-Oxley Act,

5  which accompanied the 1Q2010 10-Q. The certifications were substantially similar to

6  the certifications referenced in ¶ 31 above.

7      39.    On May 17, 2010, RINO issued a press release titled, "RINO

8  International Corp. Announces First Quarter 2010 Financial Results." The release

9  reported continued escalating revenues:

10     2010 First Quarter Financial Results

11     Net revenues for the first quarter ended March 31, 2010 increased 34.4%

12     to $47.9 million as compared to $35.6 million for the first quarter in

13     2009. Revenue growth was driven by continued growth in demand across

14     its three major product lines. Specifically, the Company recorded $33.9

15     million in desulphurization revenues, an increase of 32.0% from $25.7

16     million in same period 2009, with $4.8 million related to the Huanan

17     Lianyuan DXT project; $10.8 million in wastewater treatment system

18     sales, an increase of 49.1% over the first quarter in 2009; and $3.0

19     million in anti-oxidation equipment and coatings as compared to $2.4

20     million recorded in the same period in 2009.

                              * * *

22     "During the first quarter of 2010, we delivered measured revenue growth

23     through the execution of several major projects, including both

24     desulphurization and wastewater treatment systems," commented Mr.

25     Zou Dejun, President and CEO of RINO International. "We are pleased

26     with the momentum in our business as evidenced by our backlog and

27     expect a robust second half of the year as the State Environmental

28     Protection Agency (SEPA) maintains a supportive policy to reduce the

sulphur emissions for iron and steel producers, while aging wastewater

infrastructure systems force prospective customers to accelerate purchase

decisions. We are confident in meeting our projects for $225 million in

revenue for 2010, representing 17% growth over 2009.["]

40.     On August 16, 2010, RINO issued a press release titled, "RINO

Announces Second Quarter 2010 Financial Results." The release stated, in part:

Second Quarter Highlights

 -- Total revenues in the second quarter of 2010 were $65.4 million, a

60.6% increase from the corresponding period in 2009.

-- Operating profit in the second quarter of 2010 was $18.1 million, a

80.5% increase from the corresponding period in 2009.

-- Net income in the second quarter of 2010 was $20.4 million, a 107.4%

increase from the corresponding period in 2009. Net income excluding

change in fair value of warrant (non-GAAP) was $15.5 million, a 33.0%

increase from the corresponding period in 2009.

-- Diluted earnings per share ("EPS") for the second quarter of 2010 was

$0.71. Diluted EPS excluding change in fair value of warrant (non-

GAAP) was $0.54, a 16.6% increase from $0.47 for the corresponding

period in 2009.

    "We are pleased to announce strong results for the second quarter

2010," said Mr. Dejun Zou, director and chief executive officer of RINO.

"The robust year-over-year revenue increase was primarily driven by

steady growth in our two main business segments, core flue gas

desulphurization and waste water treatment systems. Going forward, the

primary objective for our core business segments is to continue

expanding our market share and enhance gross margin. At the same time,

we will build out other business segments that are synergistic extensions

of our core competence. Municipal sludge treatment, for instance, is an

area of our near-term focus."

"China's clean technology industry is growing rapidly with government support. Policies and guidelines that call for increasingly stricter standards for industrial waste treatment continuously drive up demand for a greater scope of treatments as well as volume. RINO's future success depends on our ability to continue enhancing our production capacity and technological capability to keep up with industry developments. We are confident that with our focused efforts on these fronts and effective execution we will continue to be a leading player in the industry of our fundamental business segments and successfully expand into high growth segments in the future," Mr. Zou concluded. Mr. Ben Wang, chief financial officer of RINO, added, "Both top and bottom line results were very strong in the second quarter and we are on track to achieve our targets for fiscal year 2010. For the rest of the year we will continue to enhance operational systems while investing for sustainable growth in the long term. We are also progressing according to our schedule to further strengthen our internal control and to continue to comply with Sarbanes Oxley requirements."

* * *

Outlook for Fiscal Year 2010

RINO continues to expect to generate total revenues in an amount ranging from $221.0 million to $229.0 million for fiscal year 2010, representing an increase of 15% - 19% from 2009. This forecast reflects RINO's current and preliminary view, which will be subject to future changes.

41.     The statements in ¶¶ 27 – 40 were materially false and misleading for a number of reasons, including, but not limited to the following: (a) several of the Company's purported customer contracts did not exist, which caused revenues to be

1   grossly overstated; (b) revenues the Company reported to Chinese regulators were

2   much lower than those reported to the SEC (e.g., the Company reported 2009

3   revenues to Chinese regulators that were over 90 percent lower than those reported to

4   the SEC); and (c) the Company lacked adequate internal and financial controls.

5   Indeed, the Company has since admitted that its financial results for the years ended

6   2008 and 2009, as well as interim reports for the quarters ended March 31, 2008 to

7   September 30, 2009, should no longer be relied on. Further, the Company has

8   determined that its financial statements for the first three quarters of 2010 should also

9   not be relied on to the extent they incorporate results from 2008 and 2009.

10                      **THE TRUTH BEGINS TO EMERGE**

11          42.    On November 10, 2010, research firm Muddy Waters Research issued a

12   report on RINO ("MW Report"), initiating coverage on the Company's common stock

13   and rating the stock as a Strong Sell with a target price of $2.45. The MW Report

14   detailed a number of fraudulent practices at RINO and described how the Company's

15   financial results for 2008 and 2009 were false and misleading in a number of ways.

16          43.    The MW Report stated, in part:

17          RINO claims to be the leader in selling desulfurization ("FGD") and

18          other environmental equipment to Chinese steel mills. It reported 2009

19          revenue of $193 million. In reality its revenue is under $15 million, and

20          its management has diverted tens of millions of dollars for its own use.

21          **We value RINO based on the cash we believe remains in the**

22          **company after the most recent raise.**

23          •   RINO's FGD sales (60% to 75% of revenue) are much lower than

24              it claims. We found that many of its customer relationships do not

25              exist.

26          •   Chinese regulatory filings show that RINO's consolidated 2009

27              revenue was only $11 million, or 94.2% lower than it reported in

28              the U.S. We show that the Chinese numbers are credible.

- RINO's accounting has serious flaws that are clear signs of cooked books.

- RINO's management is draining cash from the company for its own business and personal uses. The management is in flagrant breach of its [Variable Interest Entity ("VIE")] agreements, which require it to pay income to RINO (as opposed to taking it).

- RINO's balance sheet has an astonishingly small amount of tangible assets for a manufacturer. Rather, it is filled with low quality "paper" assets that balance out the inflated earnings, and likely hide leakage.

- RINO is not the industry leader it claims to be in the steel sinter FGD system market. Rather, it is an obscure company in a crowded field, and is best known for its failed projects. Its reported margins are two to three times what they really are. Its technology is sub-par.

- We are not sanguine about management "borrowing" $3.2 million to purchase a luxury home in Orange County, CA the day that RINO closed its $100.0 million financing.

44.    The MW Report states that of the nine purported customers of RINO that Muddy Waters Research contacted, five denied having purchased RINO's FGD systems. In particular, although the Company reported in its 2008 10-K report that it had installed a FGD system at Yuhua Steel Co. Ltd. ("Yuhua"), the MW Report claims that "Yuhua only has one FGD system, and [] RINO was not the vendor." The MW Report confirmed that, in addition to Yuhua, RINO had fabricated customer relationships with Yueyufeng Steel Group, Lai Steel Group, Congqing Iron & Steel, and Nanchang Changli Iron & Steel.

45.    On the issuance of the MW Report, the price of RINO's common stock dropped $2.34 per share from its November 9, 2010 closing price of $15.52 to its

1   November 10, 2010 closing price of $13.18, a decline of 15.1%.

2        46.    On November 11, 2010, the Company issued a press release titled,

3   "RINO Comments on Muddy Waters Allegations." The release stated, in relevant

4   part:

5           RINO takes its responsibilities to investors very seriously and has

6           launched an internal review of Muddy Waters' allegations. RINO looks

7           forward to providing investors with a timely and detailed response to the

8           allegations upon completion of its internal review.

9           RINO is scheduled to report its unaudited financial results for the

10           third quarter ended September 30, 2010, after the U.S. market closes on

11           November 15, 2010. RINO's management will hold an earnings

12           conference call at 7 PM on November 16, 2010 U.S. Eastern Time (8 AM

13           on November 17, 2010 Beijing/Hong Kong time), at which time

14           management will comment on the allegations to the extent possible based

15           on the progress of internal review but will not hold a question and answer

16           session.

17        47.    On this news, the price of RINO's common stock dropped $2.08 per

18   share, from its November 10, 2010 closing price of $13.18 to its November 11, 2010

19   closing price of $11.10, a decline of 15.8% on abnormally high volume.

20        48.    On November 15, 2010, prior to the market opening, RINO issued a

21   press release titled, "RINO Announces Third Quarter 2010 Financial Results," in

22   which the Company announced significantly decreased revenues and net income,

23   lowered its revenue outlook for 2010 from a range of $221 - $229 million down to a

24   range of $203 - $211 million, and offered no response to the Muddy Waters

25   allegations. The release stated, in part:

26       Third Quarter Highlights

27       Total revenues in the third quarter of 2010 were $52.7 million, a 16.7%

28       decrease from the corresponding period in 2009.

1      Operating profit in the third quarter of 2010 was $9.9 million, a 49.3%

2      decrease from the corresponding period in 2009.

3      Net income in the third quarter of 2010 was $8.8 million, a 48.3%

4      decrease from the corresponding period in 2009. Net income excluding

5      change in fair value of warrants (non-GAAP) was $8.7 million, a 55.6%

6      decrease from the corresponding period in 2009.

7      Diluted earnings per share ("EPS") for the third quarter of 2010 was

8      $0.31. Diluted EPS excluding change in fair value of warrants (non-

9      GAAP) was $0.31, a 60.8% decrease from $0.78 for the corresponding

10     period in 2009.

11     49.    Also on November 15, 2010, Bloomberg reported that analyst Canaccord

12  Genuity rated RINO a "sell." According to the article, Canaccord Genuity analyst

13  Michael Deng said that, "[a]llegations of fraud from Muddy Waters report may be

14  hard to clear." Further, the article stated: "Muddy Waters report claimed 6 of 9 FGD

15  customers denied hiring RINO, Canaccord's checks with Yueyufeng also contradict

16  RINO's explanation."

17     50.    On this news, the price of RINO's common stock dropped $3.46 per

18  share, from its November 12, 2010 closing price of $11.01 to its November 15, 2010

19  closing price of $7.55, a decline of nearly 31.4% on abnormally high volume.

20     51.    On November 16, 2010, after the market closed, the Company issued a

21  press release titled, "RINO International Postpones Third Quarter 2010 Earnings

22  Conference Call." The release stated in relevant part:

23      DALIAN, China, Nov. 16, 2010 /PRNewswire-Asia-FirstCall/ -- RINO

24      International Corporation (the "Company" or "RINO") (Nasdaq: RINO),

25      a leading provider of clean technology solutions to China's iron and steel

26      industry, announced that in consultation with the chairman of the

27      Company's audit committee it has decided to postpone the conference

28      call originally scheduled for today.

1    The Company takes its responsibilities to investors very seriously and

2    looks forward to discussing its recent business results and providing

3    investors with a timely response to the recent allegations.

4        52.    On this news, the price of RINO stock dropped again until, on November

5    17, 2010, the NASDAQ halted trading in RINO with the stock price at $6.07.

6        53.    On November 19, 2010, RINO filed a report on Form 8-K with the SEC.

7    The 8-K report stated, in relevant part:

8        On November 17, 2010 Frazer Frost, LLP, the independent auditors of

9        RINO International Corporation (the "Registrant"), delivered a letter (the

10       "Auditor's Letter") to the Registrant and each of its directors. The

11       Auditor's Letter states in part:

12           "In a telephone conversation on November 16, 2010, Mr.

13           Zou Dejun, the Chief Executive Officer of the Company,

14           informed Ms. Susan Woo of our firm, in substance, that as

15           to the six RINO customer contracts discussed in the recent

16           report of Muddy Waters LLC, the Company did not in fact

17           enter into two of the six purported contracts, and a third

18           contract among the six was explainable. When Ms. Woo

19           inquired about the Company's other contracts, Mr. Zou said

20           he was not sure, but there might be problems with 20 - 40%

21           of them.

22           Assuming that these statements were reasonably accurate, it

23           appears that our reports would have been affected if this

24           information had been known to us at the date of our reports,

25           although the effect on the financial statements is currently

26           unknown and cannot be quantified without a thorough

27           investigation. We further note that in a conversation the

28           following day, November 17, 2010, involving Ms. Woo,

1   several directors of the Company, Company counsel, and

2   Mr. Zou, Mr. Zou stated that he was not sure the day before

3   and went back to look into some things, and found that apart

4   from the two problematic contracts, all other contracts are

5   legitimate and can be verified.

6   The auditing standards of the Public Company Accounting

7   Oversight Board provide procedures to be followed by an

8   auditor to prevent continued reliance on audit reports in such

9   circumstances. In view of the information provided by Mr.

10   Zou Dejun, we hereby advise the Company to promptly

11   notify any person or entity that is known to be relying upon

12   or is likely to rely upon our audit report(s) for the periods

13   ended December 31, 2008 and December 31, 2009 and

14   reviewed quarterly financial statements for periods between

15   March 31, 2008 to September 30, 2010 that they should no

16   longer be relied upon, and that revised financial statements

17   and revised auditor's report(s) will be issued upon

18   completion of an investigation."

19   54.   Also on November 19, 2010, RINO filed a second report on Form 8-K

20   with the SEC. The 8-K report stated, in relevant part:

21   On November 18, 2010, the Board of Directors (the "Board") of

22   RINO International Corporation (the "Registrant")[,] a Nevada

23   corporation, concluded that previously issued audited financial

24   statements of the Registrant for its fiscal years ended December 31, 2008

25   and 2009, which were included in the Registrant's Annual Reports on

26   Form 10-K for the fiscal years ended December 31, 2008 and 2009, and

27   previously issued interim unaudited financial statements which were

28   included in the Registrant's Quarterly Reports on Form 10-Q for the

periods ended March 31, 2008 to September 30, 2009 should no longer be relied on. The Board also concluded that previously issued interim unaudited financial statements which were included in the Registrant's Quarterly Reports on Form 10-Q for the periods March 31, 2010, June 30, 2010 and September 30, 2010 should no longer be relied on inasmuch as such financial statements incorporate results from 2008 and 2009.

The conclusion of the Board that the financial statements for the above-described periods should not be relied upon was based on statements made by the Registrant's Chief Executive Officer, Mr. Zou Dejun, after consultation with the Registrant's Chief Accountant, who reported to the Board that the Registrant did not enter into two contracts for which it reported revenue during the Registrant's 2008 and 2009 fiscal years.

(Footnote omitted.)

55.    On December 2, 2010, RINO filed an 8-K report with the SEC announcing that the NASDAQ intended to delist the Company's stock. According to the 8-K report, the NASDAQ based its delisting decision on the following:

1. The Company's announcement that its previously filed financial reports for fiscal 2008, 2009 and year-to-date 2010 could no longer be relied upon;

2. The Company's admission that it had not entered into certain previously disclosed contracts; and

3. The Company's failure to respond to the NASDAQ staff's request for additional information regarding allegations raised by the Muddy Waters, LLC report.

Accordingly, the NASDAQ delisted RINO's common stock on or about December 8, 2010.

56.    Also in the December 2, 2010 8-K report, the Company announced that

1   the SEC was conducting a formal investigation into the Company's financial reporting

2   and compliance with the Foreign Corrupt Practices Act.

3   **PLAINTIFF'S CLASS ACTION ALLEGATIONS**

4   57.   Plaintiff brings this action as a class action pursuant to Rule 23 of the

5   Federal Rules of Civil Procedure on behalf of all investors who purchased RINO

6   common stock during the Class Period and who suffered losses therefrom (the

7   "Class"). Excluded from the Class are Defendants; direct or indirect subsidiaries or

8   affiliates of RINO; the individuals serving as directors or officers of RINO during the

9   Class Period and their immediate families; the legal representatives, heirs, successors,

10   or assigns of any Defendant or director or officer of RINO; and any entity in which

11   Defendants have or had a controlling interest.

12   58.   The action brought by this Complaint is properly maintainable under

13   Rule 23(b)(3) of the Federal Rules of Civil Procedure.

14   59.   The members of the Class are so numerous that joinder of all members is

15   impracticable. Although Plaintiff does not know the exact number of Class members

16   at this time, Plaintiff believes that the proposed Class includes hundreds or thousands

17   of members. Throughout the Class Period, RINO common stock traded on the

18   NASDAQ Global Market or NASDAQ Global Select Market. As of November 15,

19   2010, RINO had 28,605,321 shares outstanding. As of March 31, 2010, there were

20   over one hundred holders of record of RINO's common stock, not including investors

21   holding stock in street name through various brokerage firms.

22   60.   Plaintiff will fairly and adequately protect the interests of the Class.

23   Plaintiff has retained competent counsel with extensive experience litigating complex

24   securities fraud class actions to prosecute the claims asserted herein on behalf Plaintiff

25   and the Class. Plaintiff has no interests which conflict with those of the Class.

26   61.   There is a well-defined community of interest in the questions of law and

27   fact involved in this case. Questions of law or fact common to the Class include:

28   (a)   Whether Defendants violated the Exchange Act;

1      (b)    Whether Defendants omitted and/or misrepresented material facts;

2      (c)    Whether Defendants' statements omitted material facts necessary in order

3             to make the statements made, in light of the circumstances under which

4             they were made, not misleading;

5      (d)    Whether Defendants knew or with deliberate recklessness disregarded

6             that their statements were false and misleading;

7      (e)    Whether the prices of RINO common stock were artificially inflated; and

8      (f)    The extent of damage sustained by Class members and the appropriate

9             measure of damages.

10     62.    Plaintiff's claims are typical of those of the Class because Plaintiff and

11  the Class sustained damages from Defendants' wrongful conduct.

12     63.    Questions of law and fact common to the members of the Class

13  predominate over questions that may affect individual Class members and a class

14  action is superior to other available methods for the fair and efficient adjudication of

15  this controversy.

16                    **ADDITIONAL SCIENTER ALLEGATIONS**

17     64.    As alleged herein, Defendants acted with scienter in that they knew or

18  with deliberate recklessness disregarded that the public documents and statements

19  issued or disseminated in the name of the Company were materially false and

20  misleading; knew or with deliberate recklessness disregarded that such statements or

21  documents would be issued or disseminated to the investing public; and knowingly

22  and substantially participated, or acted with deliberate recklessness, in the issuance or

23  dissemination of such statements or documents as primary violators of the federal

24  securities laws. Defendants participated in the fraudulent scheme alleged herein by

25  virtue of their receipt of information reflecting the true facts regarding RINO, their

26  control over or receipt or modification of RINO's materially misleading statements, or

27  their associations with the Company that made them privy to confidential proprietary

28  information concerning RINO.

1

## LOSS CAUSATION/ECONOMIC LOSS

2        65.    Defendants' wrongful conduct, as alleged herein, directly and

3    proximately caused the economic loss suffered by Plaintiff and the Class.  The price

4    of RINO common stock significantly declined when the misrepresentations made to

5    the market, and/or the information alleged herein to have been concealed from the

6    market, and/or the effects thereof, were revealed, causing investors' losses. As a result

7    of purchases of RINO common stock during the Class Period, Plaintiff and other

8    members of the Class suffered economic loss, i.e., damages, under the federal

9    securities laws.

10                    **APPLICABILITY OF PRESUMPTION OF RELIANCE:**
                     **FRAUD ON THE MARKET DOCTRINE**
11

12        66.    Plaintiff will rely upon the presumption of reliance established by the

13   fraud-on-the-market doctrine in that, among other things:

14        (a)    Defendants made public misrepresentations or failed to disclose material

15               facts concerning RINO's business and financial condition during the

16               Class Period;

17        (b)    The misrepresentations and omissions were material;

18        (c)    During the Class Period, the Company's common stock traded on the

19               NASDAQ, an efficient and open market;

20        (d)    The misrepresentations alleged would tend to induce a reasonable

21               investor to misjudge the value of the Company's common stock;

22        (e)    Plaintiff and other members of the Class purchased RINO common stock

23               between the time Defendants misrepresented or failed to disclose

24               material facts and the time the true facts were disclosed, without

25               knowledge of the misrepresented or omitted facts; and

26        (f)    RINO is followed by various analysts and news media. At all relevant

27               times, the price of RINO common stock reflected the effect of news

28               disseminated in the market.

67.     At all relevant times, the market for RINO common stock was efficient for the following reasons, among others: (a) RINO filed periodic public reports with the SEC; and (b) RINO regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts, and other similar reporting services.

## NO SAFE HARBOR

68.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the false statements pleaded in this Complaint. The specific statements pleaded herein all concern then-existing facts and conditions. The statements were not forward-looking and were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Moreover, the Defendants made the false statements alleged herein knowing that the statements were false, or made them with deliberate recklessness as to truth of the statements. None of the historic or present tense statements made by Defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by Defendants expressly related to or stated to be dependent on those historic or present tense statements when made.

///

///

///

///

## FIRST CLAIM

**Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated
Thereunder Against Defendant RINO and the Individual Defendants**

69.     Plaintiff incorporates by reference and reasserts the allegations in ¶¶ 1-68 above.

70.     This claim is brought against RINO and all of the Individual Defendants.

71.     During the Class Period, Defendants disseminated or approved the false statements specified above, which they knew or with deliberate recklessness disregarded were materially false and misleading because they contained material misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

72.     Defendants violated § 10(b) of the Exchange Act and Rule 10b-5 because they:

(a)     Employed devices, schemes, and artifices to defraud;

(b)     Made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or

(c)     Engaged in acts, practices, and a course of business that operated as a fraud or deceit upon plaintiff and other similarly situated in connection with their purchases of RINO common stock during the Class Period.

73.     Plaintiff and the Class have suffered damages because, in reliance on the integrity of the market, they paid artificially inflated prices for RINO common stock. Plaintiff and the Class would not have purchased RINO common stock at the prices they paid, or at all, if they had been aware that the market prices were artificially and falsely inflated by Defendants' misleading statements.

74.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their

purchases of RINO common stock during the Class Period.

## SECOND CLAIM

**Violation of Section 20(a) of the Exchange Act Against the Individual Defendants**

75.     Plaintiff incorporates by reference and reasserts the allegations in ¶¶ 1-74 above.

76.     The Individual Defendants acted as controlling persons of RINO within the meaning of Section 20(a) of the Exchange Act.  By virtue of their high-level positions, their ownership and contractual rights, participation in or awareness of the Company's operations, or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the statements that Plaintiff contends are false and misleading or omitted material information.  The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiff to be misleading prior to or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

77.     In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

///

///

///

///

///

///

78.    As set forth above, RINO and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

## JURY TRIAL DEMANDED

79.    Plaintiff hereby demands a trial by jury.

WHEREFORE, Plaintiff prays for relief and judgment as follows:

(a)    A determination that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b)    An award of compensatory damages in favor of Plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)    An award to Plaintiff and the Class of their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)    Such other and further relief as the Court may deem just and proper.

DATED: December 10, 2010            Respectfully submitted,


Christopher T. Heffelfinger

Christopher T. Heffelfinger
cheffelfinger@bermandevalerio.com
Matthew D. Pearson
mpearson@bermandevalerio.com
**BERMAN DeVALERIO**
One California Street, Suite 900
San Francisco, CA 94111

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Telephone: (415) 433-3200
Facsimile: (415) 433-6382

Roy L. Jacobs
rjacobs@jacobsclasslaw.com
**ROY JACOBS & ASSOCIATES**
60 East 42nd Street
46th Floor
New York, NY 10165
Telephone: (212) 867-1156
Facsimile: (212) 504-8343

**Counsel for Plaintiff Xi Zhang**

### PLAINTIFF'S CERTIFICATE

The undersigned ("Plaintiff") declares, as to the claims asserted under the federal securities laws, that:

1.      Plaintiff has reviewed the complaint of RINO International Corporation and certain other defendants.

2.      Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3.      Plaintiff is willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary.

4.      Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as approved by the court.

5.      Plaintiff made the following transactions during the Class Period in the common shares of RINO:

| Purchases | | | | Sales | | |
|---|---|---|---|---|---|---|
| Date(s) | Number of Shares | Price | | Date(s) | Number of Shares | Price |
| 10/27/2010 | 800 | $18.70 | | | | |
| 11/10/2010 | 200 | $14.80 | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

6.      During the three years prior to the date of this Certification, Plaintiff has not sought to serve or served as a representative party for a class in an action filed under the federal securities laws.

7.      I declare under penalty of perjury, this **22** day of November 2010 that the information above is accurate.

_____
Dr. Xi Zhang

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

### NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY

This case has been assigned to District Judge Cormac J. Carney  and the assigned discovery Magistrate Judge is Robert N. Block.

The case number on all documents filed with the Court should read as follows:

## SACV10- 1887 CJC (RNBx)

Pursuant to General Order 05-07 of the United States District Court for the Central District of California, the Magistrate Judge has been designated to hear discovery related motions.

All discovery related motions should be noticed on the calendar of the Magistrate Judge

================================================

### NOTICE TO COUNSEL

*A copy of this notice must be served with the summons and complaint on all defendants (if a removal action is filed, a copy of this notice must be served on all plaintiffs).*

Subsequent documents must be filed at the following location:

| [_] **Western Division** | [X] **Southern Division** | [_] **Eastern Division** |
|---|---|---|
| 312 N. Spring St., Rm. G-8 | 411 West Fourth St., Rm. 1-053 | 3470 Twelfth St., Rm. 134 |
| Los Angeles, CA 90012 | Santa Ana, CA 92701-4516 | Riverside, CA 92501 |

Failure to file at the proper location will result in your documents being returned to you.

CV-18 (03/06)        NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY

COPY

AO 440 (Rev. 12/09) Summons in a Civil Action

# UNITED STATES DISTRICT COURT
### for the
### Central District of California

| | |
|---|---|
| XI ZHANG, Individually and on Behalf of All Others Similarly Situated <br><br> *Plaintiff* <br><br> Rino International Corporation, Kennith C. Johnson, Zejin Li, Jenny Liu, Jianping Qiu, Xie Quan, Ben Wang, Li Yu, Weiguo Zhang, and Dejun Zou <br><br> *Defendant* | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

S A C V 1 0 - 0 1 8 8 7 (RNB)   CJC

Civil Action No.

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*  Rino International Corporation, Kennith C. Johnson, Zejin Li, Jenny Liu, Jianping Qiu, Xie Quan, Ben Wang, Weiguo Zhang and Dejun Zou

Rino International Corporation
30211 Avenida de las Banderas, Suite 200,
Rancho Santa Margarita, CA 92688

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure. The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:    Christopher T. Heffelfinger
Matthew D. Pearson
BERMAN DEVALERIO
One California Street, Suite 900
San Francisco, CA 94111

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*CLERK OF COURT*

**TANYA DURANT**

Date:  12-10-10

*Signature of Clerk or Deputy Clerk*

1188

AO 440 (Rev. 12/09)  Summons in a Civil Action (Page 2)

Civil Action No.

## PROOF OF SERVICE
*(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

☐ I personally served the summons on the individual at *(place)* _____

_____ on *(date)* _____ ; or

☐ I left the summons at the individual's residence or usual place of abode with *(name)* _____

_____ , a person of suitable age and discretion who resides there,

on *(date)* _____ , and mailed a copy to the individual's last known address; or

☐ I served the summons on *(name of individual)* _____ , who is

designated by law to accept service of process on behalf of *(name of organization)* _____

_____ on *(date)* _____ ; or

☐ I returned the summons unexecuted because _____ ; or

☐ Other *(specify):*



My fees are $ _____ for travel and $ _____ for services, for a total of $  0.00  .


I declare under penalty of perjury that this information is true.


Date: _____                    _____
                                                  *Server's signature*


                                         _____
                                                  *Printed name and title*


                                         _____
                                                  *Server's address*

Additional information regarding attempted service, etc:

COPY

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
CIVIL COVER SHEET

| I (a) PLAINTIFFS (Check box if you are representing yourself □)<br>XI ZHANG, Individually and on Behalf of All Others Similarly Situated | DEFENDANTS<br>RINO INTERNATIONAL CORPORATION, KENNITH C. JOHNSON, ZEJIN LI, JENNY LIU, JIANPING QIU, XIE QUAN, BEN WANG, LI YU, WEIGUO ZHANG, and DEJUN ZOU |
|---|---|
| (b) Attorneys (Firm Name, Address and Telephone Number. If you are representing yourself, provide same.)<br>Christopher T. Heffelfinger, Matthew D. Pearson<br>BERMAN DeVALERIO<br>One California Street, Suite 900, San Francisco, CA 94111, (415) 433-3200 | Attorneys (If Known) |

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

□ 1 U.S. Government Plaintiff  ☑ 3 Federal Question (U.S. Government Not a Party)

□ 2 U.S. Government Defendant  □ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** - For Diversity Cases Only
(Place an X in one box for plaintiff and one for defendant.)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | □ 1 | □ 1 | Incorporated or Principal Place of Business in this State | □ 4 | □ 4 |
| Citizen of Another State | □ 2 | □ 2 | Incorporated and Principal Place of Business in Another State | □ 5 | □ 5 |
| Citizen or Subject of a Foreign Country | □ 3 | □ 3 | Foreign Nation | □ 6 | □ 6 |

**IV. ORIGIN** (Place an X in one box only.)

☑ 1 Original Proceeding  □ 2 Removed from State Court  □ 3 Remanded from Appellate Court  □ 4 Reinstated or Reopened  □ 5 Transferred from another district (specify):  □ 6 Multi-District Litigation  □ 7 Appeal to District Judge from Magistrate Judge

**V. REQUESTED IN COMPLAINT:  JURY DEMAND:** ☑ Yes  □ No (Check 'Yes' only if demanded in complaint.)

**CLASS ACTION under F.R.C.P. 23:** ☑ Yes  □ No     □ **MONEY DEMANDED IN COMPLAINT: $** _____

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)
Complaint for violation of the federal securities laws, specifically Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (15 U.S.C. §§ 78j(b) & 78t(a)).

**VII. NATURE OF SUIT** (Place an X in one box only.)

| OTHER STATUTES | CONTRACT | TORTS PERSONAL INJURY | TORTS PERSONAL PROPERTY | PRISONER PETITIONS | LABOR |
|---|---|---|---|---|---|
| □ 400 State Reapportionment | □ 110 Insurance | □ 310 Airplane | □ 370 Other Fraud | □ 510 Motions to Vacate Sentence Habeas Corpus | □ 710 Fair Labor Standards Act |
| □ 410 Antitrust | □ 120 Marine | □ 315 Airplane Product Liability | □ 371 Truth in Lending | □ 530 General | □ 720 Labor/Mgmt. Relations |
| □ 430 Banks and Banking | □ 130 Miller Act | □ 320 Assault, Libel & Slander | □ 380 Other Personal Property Damage | □ 535 Death Penalty | □ 730 Labor/Mgmt. Reporting & Disclosure Act |
| □ 450 Commerce/ICC Rates/etc. | □ 140 Negotiable Instrument | □ 330 Fed. Employers' Liability | □ 385 Property Damage Product Liability | □ 540 Mandamus/ Other | □ 740 Railway Labor Act |
| □ 460 Deportation | □ 150 Recovery of Overpayment & Enforcement of Judgment | □ 340 Marine | BANKRUPTCY | □ 550 Civil Rights | □ 790 Other Labor Litigation |
| □ 470 Racketeer Influenced and Corrupt Organizations | □ 151 Medicare Act | □ 345 Marine Product Liability | □ 422 Appeal 28 USC 158 | □ 555 Prison Condition | □ 791 Empl. Ret. Inc. Security Act |
| □ 480 Consumer Credit | □ 152 Recovery of Defaulted Student Loan (Excl. Veterans) | □ 350 Motor Vehicle | □ 423 Withdrawal 28 USC 157 | FORFEITURE / PENALTY | PROPERTY RIGHTS |
| □ 490 Cable/Sat TV | | □ 355 Motor Vehicle Product Liability | CIVIL RIGHTS | □ 610 Agriculture | □ 820 Copyrights |
| ☑ 850 Securities/Commodities/ Exchange | □ 153 Recovery of Overpayment of Veteran's Benefits | □ 360 Other Personal Injury | □ 441 Voting | □ 620 Other Food & Drug | □ 830 Patent |
| □ 875 Customer Challenge 12 USC 3410 | □ 160 Stockholders' Suits | □ 362 Personal Injury-Med Malpractice | □ 442 Employment | □ 625 Drug Related Seizure of Property 21 USC 881 | □ 840 Trademark |
| □ 890 Other Statutory Actions | □ 190 Other Contract | □ 365 Personal Injury-Product Liability | □ 443 Housing/Acco-mmodations | | SOCIAL SECURITY |
| □ 891 Agricultural Act | □ 195 Contract Product Liability | □ 368 Asbestos Personal Injury Product Liability | □ 444 Welfare | □ 630 Liquor Laws | □ 862 Black Lung (923) |
| □ 892 Economic Stabilization Act | □ 196 Franchise | | □ 445 American with Disabilities - Employment | □ 640 R.R. & Truck | □ 863 DIWC/DIWW (405(g)) |
| □ 893 Environmental Matters | REAL PROPERTY | IMMIGRATION | | □ 650 Airline Regs | □ 864 SSID Title XVI |
| □ 894 Energy Allocation Act | □ 210 Land Condemnation | □ 462 Naturalization Application | □ 446 American with Disabilities - Other | □ 660 Occupational Safety /Health | □ 865 RSI (405(g)) |
| □ 895 Freedom of Info. Act | □ 220 Foreclosure | □ 463 Habeas Corpus-Alien Detainee | □ 440 Other Civil Rights | □ 690 Other | FEDERAL TAX SUITS |
| □ 900 Appeal of Fee Determi-nation Under Equal Access to Justice | □ 230 Rent Lease & Ejectment | □ 465 Other Immigration Actions | | | □ 870 Taxes (U.S. Plaintiff or Defendant) |
| □ 950 Constitutionality of State Statutes | □ 240 Torts to Land | | | | □ 871 IRS-Third Party 26 USC 7609 |
| | □ 245 Tort Product Liability | | | | |
| | □ 290 All Other Real Property | | | | |

**FOR OFFICE USE ONLY:     Case Number:** SACV10-01887

**AFTER COMPLETING THE FRONT SIDE OF FORM CV-71, COMPLETE THE INFORMATION REQUESTED BELOW.**

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
CIVIL COVER SHEET

**VIII(a). IDENTICAL CASES:** Has this action been previously filed in this court and dismissed, remanded or closed?  ☑ No   ☐ Yes
If yes, list case number(s): _____

**VIII(b). RELATED CASES:** Have any cases been previously filed in this court that are related to the present case? ☐ No   ☑ Yes
If yes, list case number(s): 2:10-cv-08695-VBF-VBK; 8:10-cv-01754-CJC-RNB: 2:10-cv-09011-VBF-VBK

Civil cases are deemed related if a previously filed case and the present case:
(Check all boxes that apply)   ☑ A.  Arise from the same or closely related transactions, happenings, or events; or
   ☑ B.  Call for determination of the same or substantially related or similar questions of law and fact; or
   ☑ C.  For other reasons would entail substantial duplication of labor if heard by different judges; or
   ☐ D.  Involve the same patent, trademark or copyright, and one of the factors identified above in a, b or c also is present.

**IX. VENUE:** (When completing the following information, use an additional sheet if necessary.)

(a)  List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH named plaintiff resides.
☐  Check here if the government, its agencies or employees is a named plaintiff.  If this box is checked, go to item (b).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| | Santa Clara County, CA |

(b)  List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH named defendant resides.
☐  Check here if the government, its agencies or employees is a named defendant.  If this box is checked, go to item (c).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Los Angeles County (RINO Int'l Corp.) | People's Republic of China (RINO Int'l Corp. is headquartered in China and plaintiff believes most or all of the Individual Defendants are also located in China) |

(c)  List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH claim arose.
    Note: In land condemnation cases, use the location of the tract of land involved.

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Los Angeles County (RINO Int'l Corp. maintains an office in LA County and certain allegations in the complaint occurred in Orange County) | People's Republic of China (plaintiff believes that certain allegations in the complaint underlying the claims asserted occurred in China) |

* Los Angeles, Orange, San Bernardino, Riverside, Ventura, Santa Barbara, or San Luis Obispo Counties
Note: In land condemnation cases, use the location of the tract of land involved

X. SIGNATURE OF ATTORNEY (OR PRO PER): _____   Date   December 10, 2010

Notice to Counsel/Parties:  The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law.  This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3-1 is not filed but is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet.  (For more detailed instructions, see separate instructions sheet.)

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405(g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended.  (42 U.S.C. 405(g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended.  (42 U.S.C. (g)) |